RECEIVED
U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

2005 DEC 13 PM 7:04

NANCY M.
MAYER-WHITTINGTON
CLERK

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ELLIOTTE PATRICK COLEMAN
2730 Knox Terrace, S.E.
Washington, D.C. 20020

Plaintiff,

v.                                          Civil Action No.: 05-1206 (RCL)

THE INT. BRO. OF ELECTRICAL WORKERS
900 7TH STREEET, N.W.
WASHINGTON, D.C. 20001
Attn: Edwin Hill

Defendant.

## AMENDED COMPLAINT

1.     This is an action complaining of retaliation in employment in violation of Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. ¶ 2000e-3 and the D.C. Human Rights Act of 1977 ¶ 2-1402.61(a); refusal to bargain in good faith in violation of the National Labor Relations Act, 29 U.S.C. ¶ 159 et. seq. and stating claims arising under the common law.

### Jurisdiction and Venue

2.     The jurisdiction of this Court is invoked pursuant to 42 U.S.C. ¶ 2000e-5(f)(1) and 29 U.S.C. ¶ 412 and pendent and ancillary jurisdiction to hear and decide claims arising under the common and statutory law of the District of Columbia.

3.     Plaintiff has exhausted all of his administrative remedies as required by law, in that he timely filed a charge of discrimination with the U.S. Equal Employment Opportunities Commission (EEOC) on November 5, 2004. The Commission issued Plaintiff a "right-to-sue" letter dated March 1, 2005. Plaintiff received the notice on or about March 5,

RECEIVED
DEC 1 3 2005
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

2005. Plaintiff filed a complaint in U.S. District Court for the District of Columbia on June 3, 2005.

4. Venue is proper in this Honorable Court pursuant to 28 U.S.C. * 1391 (c).

Parties

5. Plaintiff Elliotte Patrick Coleman is a natural person and a resident of the District of Columbia. He complains of unlawful discrimination in retaliation for exercising his rights according to law, violations of the National Labor Relations Act and advances claims under the common law of the District of Columbia. His employment by Potomac Electric Power Company (Pepco) became effective in October, 1997. Pepco wrongfully terminated his employment for the second time in March, 2004.

6. Defendant The International Brotherhood of Electrical Workers (IBEW), which is domiciled in the District, is a corporation. Local 1900 of the IBEW (Local 1900) represented Pepco's bargaining unit employees.

Facts

7. In October, 1997 Plaintiff (Black) accepted the position of Customer Service Representative within Pepco's Customer Operations Division (COD). Shortly thereafter he became a dues paying member of Local 1900.

8. The vast majority of employees within COD were Black.

9. Pepco routinely discriminated against Blacks and often retaliated against those who opposed the practice.

10. Defendant and Pepco shared what both defined a "cooperative relationship."

11. Since the effective date of Plaintiff's employment a disproportionate number of Black bargaining unit employees have been terminated from employment. In many instances Local 1900 negotiated agreements which effectuated and sustained the terminations.

12. Pepco repeatedly denied Plaintiff employment opportunities, repeatedly took

2

unwarranted disciplinary actions against him and in other ways subjected him to a hostile work environment for opposing its discriminatory practices.

13. Defendant collaborated with Pepco as it retaliated against Plaintiff. These instances of collaboration include, but are not limited to, the following:

　　a. it attended grievance meetings on behalf of Plaintiff and later withheld its documentation of the meeting in order to camouflage Pepco's wrongdoing and to fortify the wrongful action taken against him;

　　b. it ordered Union representation to refrain from conversing with Plaintiff regarding grievances that it had filed on his behalf;

　　c. it failed to enforce provisions of the Contract Agreement between itself and Pepco as it related to the timely processing of grievances;

　　d. it failed to require Pepco to present witnesses, testimony or documentation to justify disciplinary actions taken against Plaintiff;

　　e. it failed to interview key witnesses and to secure information to aid in Plaintiff's defense;

　　f. it repeatedly failed to take appropriate remedial action in response to Plaintiff's complaints of harassment;

　　g. it conspired with Pepco to effectuate and to sustain the 2nd wrongful termination of Plaintiff's employment;

　　h. it discouraged CD employees from opposing discriminatory practices.

14. In May 2000 Plaintiff filed a charge of discrimination with the EEOC within which he named Pepco as respondent. He did not exercise his right to sue.[1] Pepco retaliated.

15. On February 1, Charles Dickerson, Manager, COD summoned Plaintiff into his office and placed him on Decision Making Leave (DML) which is the last level of discipline prior

---

[1] The EEOC issued a right to sue letter in September 2000. The 90 day period within which Plaintiff could exercise his right to sue expired in December 2000.

3

to termination. Dickerson denied Plaintiff his right to select a shop steward of his choosing and insisted that Earnest Harrison, Chief Steward, attend on Plaintiff's behalf.

16. During the meeting Dickerson provided his detailed rendition of Plaintiff's conduct, identified 2 specific Company policies he alleged Plaintiff had violated, attempted to explain how Plaintiff's conduct violated those policies and how the conduct warranted the DML. Both Harrison and Plaintiff took detailed notes.

17. Immediately following the February 1 meeting Plaintiff discussed the disciplinary action with Harrison and a number of Union officials. All agreed that even if Dickerson's rendition of Plaintiff's conduct was accurate, which it was not, the conduct could not have possibly warranted the DML.

18. Approximately 1 week later Pepco provided Plaintiff its untimely written notification of the disciplinary action. Plaintiff immediately noticed that Pepco had dramatically changed its rendition of his conduct to make it fit the perquisites required to result in violations of the 2 Company policies Dickerson identified on February 1. Plaintiff immediately contacted Harrison. Harrison refused to discuss the matter.

19. During the months that followed Plaintiff repeatedly contacted Union officials who repeatedly refused to come forth with, or discuss, its record of the February 1 meeting without explanation.

20. Pepco promoted Harrison to a non-bargaining unit (exempt) supervisory position within its Credit Department.

21. Union officials instructed shop stewards to refrain from any discussion with Plaintiff regarding grievances Local 1900 had filed on his behalf or any other matter regarding his employment.

22. In January 2002 the February 1 DML culminated into the wrongful termination of Plaintiff's employment. To effectuate the termination Pepco accused Plaintiff of violating a

4

Company policy that did not exist. Defendant and Pepco knew full well that the action was unjustifiable.

23. Following the termination Pepco forwarded Plaintiff a Settlement Agreement and General Release of Claims through Local 1900. Pepco offered to restore Plaintiff employment if he agreed to forever discharge Pepco and Local 1900 from any claims.[2] Plaintiff declined the offer.

24. On March 18, 2002 Ira F. Jaffe, Impartial Arbitrator, ordered Pepco to reinstate Plaintiff's employment. Following the reinstatement of his employment Pepco continued to harassed him with impunity. These acts included, but were not limited to, the following:

    a. it issued him a Written Reminder for allegedly violating its attendance policy while knowing full well that the action was unjustifiable;

    b. it charged him as having reported late to work while knowing full well that the action was unwarranted;

    c. it placed him on Decision Making Leave ("DML") while knowing that the action was unwarranted;

    d. it stole personal items which belonged to him;

    e. it opened his personal mail;

    f. it wrongfully and repeatedly denied him family medical leave;

    g. it repeatedly recorded false statements regarding his work performance and conduct;

25. Although Plaintiff repeatedly informed Local 1900 of the harassment it failed to take appropriate remedial action. Plaintiff sought intervention by the court. On May 17, 2003 he filed a retaliation claim against Pepco in U.S. District Court.

26. Pursuant to Article 17 of the Contract Agreement, Step 2 Grievance Meetings are

---

[2] The proposed agreement contained other conditions.

to be held within 9 weeks of the date the grievance is filed. Any delays are to be agreed upon by both parties. The hostile work environment created and perpetuated by Pepco was reinforced by Defendant's refusal to enforce the grievance provisions of the Contract Agreement. For example, on March 13, 2003 Pepco issued Plaintiff a Written Reminder. Defendant filed Grievance # 03-31 on March 19, 2003. Pepco did not conduct the Step 2 meeting until December 2, 2003 (nearly 9 months later).[3] Defendant stated that it had not agreed to these delays.[4]

27.    In preparation for the 2002 arbitration hearing Defendant repeatedly informed Plaintiff that Pepco was required to present any and all witnesses, testimony and any evidence it relied upon to substantiate disciplinary actions during the Step 2 Grievance Meeting.

28.    On December 2, 2003 Pepco conducted a Step 2 Grievance Meeting regarding a Written Reminder and DML it had issued Plaintiff. Joseph Hawkins, Business Representative, Local 1900 and Tiajuanna Barnes, Shop Steward attended on behalf of Plaintiff.[5] Plaintiff also attended the meeting.

29.    During the December 2 meeting Pepco presented 1 witness, Merriell Briscoe, Supervisor, Customer Operations Division in an effort to substantiate the Written Reminder. It did not present any written documentation to substantiate the action. During the meeting Briscoe made statements which clearly demonstrated that the Written Reminder was unjustifiable.

30.    During the December 2 meeting Pepco did not present any witnesses, testimony, evidence or make any statement whatsoever regarding the DML. Defendant made no objection.

31.    Pepco's acts of harassment became so pervasive that Plaintiff attended a prescheduled appointment on December 5 within Pepco's Department of Employee Relations to file a formal complaint of harassment. That same day Plaintiff's immediate supervisor accused

---

[3] Pepco scheduled the December 2 meeting only after Plaintiff raised the issue in a civil action between itself and Plaintiff.
[4] On July 18, 2003 Plaintiff filed a Charge of Discrimination (retaliation) with the EEOC against Local 1900.
[5] Barnes, while acting as Shop Steward, had previously accompanied Plaintiff to a number of meetings with Pepco during which time issues regarding his employment were discussed.

6

him of having attended the meeting without her approval.

32. Pepco refused to respond substantively to Plaintiff's complaint. Plaintiff persisted in his effort to secure an adequate response by bringing the matter to the attention of Michael Sullivan, Vice-President of Customer Care. Rather than answer the complaint, Pepco opted to terminate his employment.

33. On March 5, 2004 Pepco suspended Plaintiff's employment and notified him of its intent to terminate his employment for allegedly attending the December 5 meeting without supervisory approval. On March 8, 2004 Pepco verbally informed Plaintiff of its intent to move forward with the termination.

34. In response to the pending termination Local 1900 informed Plaintiff that it would file a grievance and would arbitrate the termination and each pending grievance in an effort to restore Plaintiff's employment.

35. On or about March 10 Local 1900 contacted Plaintiff with an offer. According to Local 1900 Pepco had agreed to return Plaintiff to work if he agreed to return under a fresh DML and waive his right to further grieve all previous disciplinary actions. In describing the agreement Local 1900 made referenced to an agreement that Pepco and Local 1900 had negotiated on behalf of Kenneth Boyd. Plaintiff declined the offer.[6] Pepco forwarded Plaintiff a notice of termination the following day.

36. Subsequent to the termination a Union member made a number of statements which caused Plaintiff to further question the integrity of the cooperative relationship Defendant shared with Pepco. These statements included, but were not limited to, the following:

    a. she stated that she had overheard Union officials conspiring to negatively impact upon the employment of a fellow Union member and close personal friend.

---

[6] Defendant and Pepco had negotiated a similar agreement for Kenneth Boyd, another Black employee within Customer Operations. Shortly following his return to work Boyd was terminated without recourse.

7

   b.  she stated that his superior had described the poor manner in which Joseph Hawkins, Local 1900 Business Representative had represented Union members during arbitration hearings and important meetings. She expressed concern that his superior had not intervened on behalf of the union membership.

37. Barnes, while serving as shop steward, attended numerous meetings during which time Pepco and Plaintiff discussed issues regarding his employment. She was familiar with the numerous complaints of harassment made by Plaintiff and the circumstances of each incident.

38. Shortly after Plaintiff filed the claim of retaliation against Pepco in U.S. District Court Pepco and Defendant began to offer Barnes incentives. For example, Pepco reassigned Barnes to the position of Dispatcher which is a preferred position within the Customer Operations Division. Local 1900 also offered incentives. For example, although recently appointed to the position of Shop Steward, Local 1900 selected her to serve on a committee which negotiated the Contract Agreement on behalf of Local 1900. The assignment afforded her the opportunity to work directly with the Union at a remote location for months during normal work hours.[7]

39. During the course of the civil action between Plaintiff and Pepco Local 1900 relayed updates regarding the action to COD employees and in other ways discouraged others from opposing discriminatory practices.

40. During week ending June 19, 2004 Defendant informed Plaintiff that it had scheduled an arbitration hearing for June 29, 2004.[8]

41. On or about June 24 Barnes, Hawkins and Plaintiff met to prepare for the hearing. Barnes and Plaintiff recalled and discussed statements made by Briscoe during the Step

---

[7] Other Union employees and potential witnesses for Plaintiff were also offered incentives by Pepco.
[8] Parties scheduled Grievance 03-31 filed by Local 1900 in response to Written Reminder for arbitration.

8

2 meeting which clearly supported Defendant's position that the Written Reminder was unjustifiable. That same day Hawkins informed Plaintiff that Pepco and Local 1900 was actively attempting to settle the grievance prior to the hearing.

42. On June 28 (1 day prior to the hearing) Barnes, Hawkins and Plaintiff met for the second time to prepare for the hearing. Ironically, Barnes could no longer recall Briscoe having made specific statements that she had recalled only days earlier. Barnes stated that she would return home to review her notes and call back with her record of Briscoe's statements. Although Hawkins and Plaintiff remained for a substantial period of time neither received the return call from Barnes.

43. The arbitration hearing was conducted on June 29, 2004. During the hearing Briscoe presented testimony which was a complete reversal of statements she had made during the December 2 Step 2 meeting. Barnes did not attend the hearing. As a result, Plaintiff had no witness to substantiate that Briscoe's testimony was a reversal of statements made by her during the December 2 meeting.. Additionally, Pepco presented numerous witnesses and documentation (which did not support it's position) that it had not presented during the Step 2 meeting. Defendant offered no objection whatsoever.

44. The Arbitrator denied the Grievance by correspondence dated July 13, 2004.

45. On July 30, 2004 Plaintiff forwarded Defendant correspondence within which he expressed concern regarding its repeated mishandled of meeting minutes and notes and its repeated refusal to be forthcoming with its recollections of statements made by Pepco during meetings regarding issues of his employment. He also requested clarification regarding Pepco's duty to present testimony and evidence during Step 2 grievance meetings. Plaintiff's inquiry was justifiable in that Defendant had previously forwarded notice of its intent to arbitrate the the June 12, 2003 DML and March 11, 2004 termination. Defendant refused to respond to the inquiry.

9

46. In August, 2004 Plaintiff requested to meet with Defendant to discuss 2 pending grievances. Upon requesting the meeting Plaintiff informed Defendant that he sought to determine if it had retained records of meetings conducted by Pepco regarding his employment, to discuss testimony and evidence Defendant intended on presenting in support of the grievances, to determine if it required additional information from Plaintiff and/or other witnesses in order to support the grievances, et. cetera. Defendant refused to meet with Plaintiff.

47. In July, 2005 Defendant contacted Plaintiff to inform him that it was attempting to schedule an arbitration hearing for the latter part of July. Plaintiff expressed concern that Defendant had not responded to concerns expressed by him regarding the prior arbitration hearing and that he desired an explanation in order to weigh his options. Again, Defendant refused to respond.

48. Defendant habitually failed to act in the best interest of employees within COD particularly when Pepco would be required to expend substantial resources in order to make employees whole.

49. On or about June 14, 2000 Plaintiff was diagnosed as suffering from work related stress, anxiety and depression. Subsequently, the harassment became so pervasive that the condition exacerbated in to a "serious health condition" as defined within the Family and Medical Leave Act of 1993.

50. On or about December 27, 2001 Colonial HealthCare Inc. (CHI), Pepco's Third Party Health Care Administrator, certified that Plaintiff would be taking family medical leave (FML) on an as needed basis between November 27, 2001 thru May 27, 2002. Colonial HealthCare repeatedly renewed the certification. Plaintiff remained certified to take FML through the March 11, 2004 termination of his employment.

51. Pepco and Defendant knew that its acts of harassment exacerbated Plaintiff medical condition.

## Count One: Retaliation

52. Plaintiff repeats and realleges ¶¶ 1-51, *supra*, as if fully set forth herein.

53. Plaintiff took all proper measures to bring to the attention of Pepco and Defendant his complaints of harassment.

54. Pepco's repeated acts of retaliation against Plaintiff were committed with malice and forethought. Defendant willfully and intentionally aided and abetted in the retaliation.

55. Despite those repeated complaints, Defendant failed to properly attend to these matters.

56. Plaintiff's charges with the EEOC, complaints filed in U.S. District Court, complaints to his superiors, complaints to Defendant and other appropriate personnel were conduct protected under provisions of Title VII of the Civil Rights Acts of 1964, as amended, 42 U.S.C. § 2000e-3(a), which are incorporated into 42 U.S.C. § 2000e-16.

57. After Plaintiff engaged in said protected activity his employment was terminated.

58. Those who participated in the retaliation had knowledge of his protected activity. They included the individuals to whom his complaints were addressed.

59. As a direct and proximate result of Defendant's collusion with Pepco in committing acts of retaliation and harassment, Plaintiff suffered substantial injury.

60. All of the foregoing individual incidents amount to a pattern and practice of violations of the laws of the United States and the District of Columbia prohibiting retaliation against employees exercising their statutory rights to protest discrimination and harassment in employment.

WHEREFORE, Plaintiff Elliotte Patrick Coleman demands judgement against Defendant The International Brotherhood of Electrical Workers for compensatory damages in the amount of Three Hundred Thousand Dollars ($300,000.00) or an amount that the Court would deem just and equitable.

WHEREFORE, Plaintiff Elliotte Patrick Coleman demands judgement against Defendant The International Brotherhood of Electrical Workers for punitive damages in the amount of Seven Million and Seven Hundred Thousand Dollars ($7,700,000.00) or an amount that the Court would deem just and equitable.

### Count Two: Breach of Duty of Fair Representation

61. Plaintiff repeats and realleges ¶¶ 1-51, *supra*, as if fully set forth herein.

62. Defendant failed to fairly represent Plaintiff in the handling of his grievances, failed to take appropriate remedial action in response to Plaintiff's complaints of harassment and collaborated with Pepco in negatively impacting upon his employment.

63. Defendant's conduct towards Plaintiff was arbitrary, discriminatory, perfunctorily was committed in bad faith and was a result of collusion.

WHEREFORE, Plaintiff Elliotte Patrick Coleman demands judgement against Defendant The International Brotherhood of Electrical Workers for compensatory damages in the amount of Three Hundred Thousand Dollars ($300,000.00) or an amount that the Court would deem just and equitable.

WHEREFORE, Plaintiff Elliotte Patrick Coleman demands judgement against Defendant The International Brotherhood of Electrical Workers for punitive damages in the amount of Seven Million and Seven Hundred Thousand Dollars ($7,700,000.00) or an amount that the Court would deem just and equitable

### Count Three: Intentional Infliction of Emotional Distress

64. Plaintiff repeats and realleges ¶¶ 1-51, *supra*, as if fully set forth herein.

65. Pepco's acts of retaliation and harassment were committed willfully, maliciously, outrageously, deliberately, and purposely with the intent to inflict emotional distress upon Plaintiff and/or were done in reckless disregard of the probability of causing Plaintiff emotional

distress. Defendant aided and abetted Pepco and worked in collusion with it in committing these acts.

66.   Said conduct caused Plaintiff to suffer severe and extreme emotional distress which included; but was not limited to, mental suffering, fright, nervousness, indignity, humiliation, embarrassment, insult and loss of consortium.

67.   As a direct and proximate result of the acts alleged herein, Plaintiff obtained medical treatment over an extended period of time.

WHEREFORE, Plaintiff Elliotte Patrick Coleman demands judgement against Defendant The International Brotherhood of Electrical Workers for compensatory damages in the amount of Fifteen Million Dollars ($14,000,000.00) or an amount that the Court deems just and equitable.

WHEREFORE, Plaintiff Elliotte Patrick Coleman demands judgement against Defendant The International Brotherhood of Electrical Workers for punitive damages in the amount of Twenty Million Dollars ($20,000,000.00) or an amount that the Court deems just and equitable.

### Prayer for Additional Relief

WHEREFORE, Plaintiff Elliotte Patrick Coleman prays that this Honorable Court:

a.   ASSUME jurisdiction over this Action for all purposes;

b.   AWARD to him such additional relief as is permitted by law;

c.   GRANT him the costs of this Action, including reasonable attorneys' fees; and

d.   AWARD such additional relief as to the Court shall appear just and equitable.

Plaintiff respectfully requests trial by jury as to all issues so triable at law including damages.

Respectfully submitted,

*Elliotte P. Coleman*
Elliotte P. Coleman

2730 Knox Terrace, S.E.
Washington, D.C. 20020
(202) 714-7961

Dated:   December 12, 2005